My name is Elizabeth Schwantor, and together with co-counsel Mr. Yegley, under the supervision of Monica Sherman, I represent Adel Yosif. This case is about a man, Adel Yosif. Mr. Yosif received two death threats. The first addressed to Adel and his family. The second contained bullets. And the threat was leave the home or you'll be killed, something to that effect, is that right? Yes, Your Honor, leave the home or you'll be executed. And they did leave the home? The family left the home within three days of the second threat, which was received in February of 2007. And then when they did leave the home, were they bothered again? Your Honor, at the close of the administrative record, Mr. Yosif's family had not been bothered again in regard to a specific threat. However, the al-Sadr militia showed up at his grandparents' doorstep to register him. National ID cards contained Mr. Yosif's religion, so he was identified by the Shiite militias when he fled, which subsequently led him to flee to the United States. Let me ask you a question, Counselor. Maybe it's because I was on the district bench for too long. Maybe it's just because I don't have it quite in my head what I ought to be doing here. But it seems to me that I have a standard of review I have to look at here. What is the standard of review? Your Honor, the standard of review in determining whether or not an alien qualifies for asylum is substantial evidence. All right. So if I have substantial evidence, that means that the Ninth Circuit, in looking at this particular matter, cannot simply disagree. They must look to see whether there's substantial evidence in the record. Isn't that true? Yes, Your Honor. That's correct. And therefore, one has to look at what evidence was in front of this particular body, IJBIA, and determine if there's evidence there which would sustain what they did, even though there may be contrary evidence or even, in some instances, contrary cases. Certainly, Your Honor is correct. However, the court in Garavizas pointed out that the substantial evidence standard does not preclude a court from vacating and remanding a case for further consideration where the BIA's denial was based on an error of law. Well, what error of law is there when what we're looking at is facts here? We're looking at the facts which happened to this particular individual as he was in his country, and we're trying to determine then if those facts which happened to him would have anything in that record which would suggest there was substantial evidence to sustain the IJ or BIA decision. Isn't that what we're looking for? What error of law is there which suggests that one cannot look at the facts in the record and determine then if there is substantial evidence to sustain what the IJ or BIA did? Your Honor, I will specifically address the issue of past persecution. In looking at past persecution, had the agency applied the proper law, substantial evidence would have compelled a conclusion in our favor. However, there are specifically three instances that I would like to draw attention to today where the agency erred. First, the agency erred in not finding past persecution when Mr. Yusuf was in the midst of an ethnic cleansing campaign such as in Knezevich. Mr. Yusuf was a victim of ethno-religious cleansing. At 138 in the record, the immigration judge noted this similarity. In Knezevich, the court there found that the petitioners suffered past persecution on accounts of a statutorily protected ground when they feared for their lives due to the well-known fact that the Croat forces intended to eliminate all Serbs. Similarly, Mr. Yusuf testified that the Shiite militias intended to eliminate the country of Iraq of all Sunnis. This is further corroborated by specific and direct evidence within the country reports. But aren't we really saying you're arguing the best facts that you can for what you're suggesting your opinion of this particular case is or how you want to argue it? But what we're really looking at, are there any facts in the record which would sustain what the IJ did? Threats, in general, are not enough. In general, if you look at the cases, threats generally go to future persecution, not past persecution. Your Honor, I would respectfully disagree. In fact, the immigration judge in this case cited Lim for that proposition. That's the case he primarily relied on? Yes, he said that threats do not amount to past persecution. However, the circuit has held that threats do amount to past persecution. No, threats can, not do. Thank you, Your Honor. Under the entire circumstances of the context. The Knezovic case is very massively different than this case in terms of the facts and circumstances. I mean, that case, there was violence all over the place, bombings, fires, attacks, attempts to relocate. That was a furious case on its facts compared to this case. Your Honor, the facts are different. Much different. However, the immigration judge did note a similarity, which I would hope you consider today. And that is that what is going on between the Shias and the Sunnis amounts to ethno-religious cleansing. And because of that, Mr. Yusuf suffered past persecution. Well, there's a jurisdictional issue on that because this precise issue wasn't brought to the attention of the BIA. If I read what was brought to the BIA, it was substantially different. And the government tells us that you didn't identify a pattern in practice in the aspects that you're now bringing to our attention before the BIA. So there's a failure to exhaust, which would leave us without jurisdiction. What's your answer to that? I read your reply brief, but what's your answer to that? Thank you, Your Honor. I see that my time is out, and Mr. Yigley will address that question. Okay. May I please record? My name is Rob Yigley, and I'll be addressing future persecution. To get to your question there on that specific issue, Your Honor, this case falls squarely within the Abebe case, Abebe I, because I know there was a second Abebe totally unrelated to that that came out later on. It falls squarely within that in that the IJ – I'm sorry, the BIA issued a Bourbonno Affirmative, where it did not disagree with any parts of the IJ's decision. Mr. Yosef's attorney admittedly could have done a better job below. However, he did argue that there was past persecution, that there was a nexus, that – Where did he argue that there was past persecution, however, based on pattern and practice? Because you have to go back and see precisely – you may be right under Abebe and Bourbonno, but then you have to go back and look at the precise arguments made to the IJ. Certainly, Your Honor. Regarding past persecution, I refer you to the record at AR 153. He argued that Mr. Yosef suffered past persecution on account of his religion. Regarding pattern and practice, AR at 135, Your Honor, specifically stated that there was a pattern and practice of persecution. Is that Mr. Tucker? Yes, Your Honor, that was. That there is a pattern and practice of persecuting people on the basis of whether or not they are considered to support, and that's, again, the imputed political opinion of their religious group. So you think that's enough? Yes, Your Honor, in combination with the opening brief that he submitted to the immigration judge. Is Exhibit B part of that? Excuse me, Your Honor? Is Exhibit B part of that? Yes, Your Honor. It was the opening brief, which contains the country report, the UNHCR report, and what have you. When one looks through the arguments that Mr. Yosef's attorney made, these issues were before the immigration judge. And as Etta Gaines said, where the BIA issues a bravado affirmance, all issues put before the IJ are before the BIA, and hence this issue was exhausted, Your Honor. Well, we agree with that, but I guess the facts that you are suggesting or the situation as you're presenting it, that is the place where these issues were presented to the IJ, in your mind. Because there's no question that issues presented to the IJ under a bravado affirmance, or bravado or whatever they call them, from southeast Idaho, so I don't know exactly how to say that, but that they are come up that way. But the bottom line is, only issues presented to the IJ are there. Even though they say bravado, that doesn't mean that every issue under the sun can be there. Only the issues that are specifically in front of the IJ. That's why my colleague's questions were pretty important to me. That's the only place you can find those facts being argued to the IJ? Your Honor, those are places in the record where it was argued. In addition, I would like to point out on the record at 137 and 138, the IJ himself recognized that this, what was occurring here, was akin to the same ethnic cleansing that was taking place in the Balkans, similar to the Knezevich case. The Knezevich deals both with ethnic cleansing on a past persecution basis and on ethnic cleansing on a future persecution basis, specifically on pattern and practice. The IJ did recognize this, and this reasonably should have signaled to the agency that these issues were on the table, Your Honor. So therefore, you're suggesting it's on the table and we're now looking at future persecution, and if I don't believe there's substantial evidence as to past persecution, or I don't believe that the substantial evidence would not undo the IJ's finding on past persecution, you've got to have some evidence, or I've got to have no substantial evidence to sustain the future persecution. And here, looking at the evidence, the petitioner and his family moved out of the neighborhood. They were never threatened again. The family was never harmed again. Even though registered, nothing happened. How do I suggest that that is not substantial evidence of no future persecution? For one thing, Your Honor, as far as the threats against Mr. Yusuf go, he left very soon after the registration. He was no longer there for them to threaten him. In addition, his parents were at the grandparents, which Mr. Yusuf indicated was no safer than where they were before, and then they moved soon after that to Al-Taramiya, where he indicated they were no safer than they were before. So his family, during this eight-month period between the time he fled and the time that he had his merits hearing, his family moved a couple of times there. And so while, yes, nothing happened to them, they were on the move, so it was more difficult for these militias to find them. Let me ask you another question. As I review this record, it seemed to me that your client faced the same threat as other Sunni Muslims everywhere. I don't know whether one can, from that indication, suggest that there's a pattern or practice of persecution of Sunni Muslims. Your Honor, my time is almost up, and I'd like to be first. Well, I could address your question as well. In the dome, this court stated that even in situations of widespread civil strife, it's irrelevant whether one person, 20 persons, or 1,000 persons were targeted or placed at risk, so long as there's a nexus to a protected ground. The Sunnis are a minority in Iraq, and these threats were occurring. This court is to look at the specific facts of this case and make its determination. If I look at the threats, it seems to me that the threats simply said, get out of the neighborhood, and that's different than the other cases where we say, we don't like you, and we're going to come after you no matter where you go and what you've done because of who you are. But this is almost like a get out of town before sunset thing. Isn't that somewhat different than the other kinds of threat cases we had? There may be a distinction there, Your Honor. However, where they went after that, they were registered by the al-Sadr militia in a situation where these militias were engaging in death squad attacks, and they were in fear of their lives. One other point I'd like to make, Your Honor, regarding the substantial evidence standard. In a recent case, Sinha v. Holder, this court found that where an I.J. did not apply the correct law to the facts at hand, that substantial evidence did not support the I.J.'s decision on a finding of nexus. And what's the incorrect law you say was applied here? Here, Your Honor, the I.J. did not apply the Konezovich standard to internal relocation. He did not find that internal relocation was safe. I've looked at Konezovich's opinion a couple of times, and that seems so far afield compared to exactly what happened in that case to what happened in this case that I'm not sure that it controls. Your Honor, I would respectfully disagree with you on that particular issue. Why? The reason, Your Honor, is because Konezovich requires that first a finding is made that it's safe to relocate, second that it's reasonable. In this case, the I.J. skipped over the safety prong, went through the remaining regulatory factors, essentially ignored a great deal of evidence on the ground. How do you know he skipped over the prong when he says he didn't? He said, I considered the regulations in 1208.13b.3. Yes, Your Honor. He didn't specifically state the fact that could he avoid harm, other serious harm by moving to a, excuse me, avoid serious harm by relocating. He did not take that factor into account. After he took the other factors into account, then he concluded that there was no place safe in Iraq, but that it was okay for him to relocate. That ignores this Court's holding in Konezovich. Thank you. Thank you. Counsel for the government. Good morning, and may it please the Court. My name is Paul Fiorino. I represent the Attorney General. Beginning with the standard of review, in order for the Court to reverse the board of the immigration judge, it would have to find that the evidence of this record would compel a finding of either past persecution or well-founded How do you distinguish this case from the Garovilas case? Garovilas, well, the Court actually distinguished this case, and distinguished Garovilas and Lim, which we think is the leading case. Garovilas basically said in dicta that threats, these threats on remand may constitute persecution. But this Court, subsequently in the Lim case, which we think is the leading case, concluded that threats themselves rarely constitute past persecution, except in extreme cases, which facts we do not have on this record. What's your answer to the other side's contention that the IJ completely ignored the law and made a legal mistake by not following the Knezevich prescription, and therefore automatically there's not substantial evidence? Well, we disagree with that. With respect to the immigration judge following the regulatory factors for determining relocation, he did. I believe we set out in our brief that he specifically said, I've read these factors and relocation is feasible and reasonable. And how do we know that? Because it actually happened. This case is in a factually different posture than in many cases because we have an unusual situation where relocation actually has happened. His family has moved from the neighborhood where they were threatened to a neighborhood where they are no longer threatened. We believe on the facts of this case that evidence doesn't compel finding that he has a well-founded fear of future persecution or that he's more likely than not to be persecuted. And so how do you distinguish this case from that grave case of Sinha? The only reason I say grave case is I was part of the majority. I don't think that – I did read Sinha last week, Your Honor. I don't – to the extent that Sinha deals with legal error, we would say that there's no legal error here. And I'm not entirely familiar, Your Honor, I apologize, with the majority opinion in Sinha. There was no majority, so – or I mean no minority, so it was the only opinion. But the bottom line is in Sinha we were really talking about whether the government had done all that they needed to about country factors. The government had done everything they need to as far as we said in that case that the factors involved there were enough to establish the past persecution. And so I wondered if you'd focused in on the differences between the facts in that situation and this. Unfortunately, Your Honor, I am not prepared to distinguish that. The reason is – and I would like to again bring the Court back to Lim, because we think that this case falls squarely under Lim. You compare the facts in this case with what happened in Lim, and it's almost on all fours. In Lim he had two threats. He was a police officer who subsequently quit his job and he moved. And following his resignation from his job, he had people following him. This Court said that that is not enough to constitute past persecution. We think the facts of this case are very similar, and certainly this record doesn't compel a reversal of that. Anything further you want to suggest, Counsel? I'd like you to address the jurisdiction issue. Yes, Your Honor. With respect to the issue of pattern of practice, we agree that on page 135 of the record, the petitioner did mention the words pattern of practice. He did say those words. That was really never a part of his case in chief, because if you look at his argument before the immigration judge and also his pre-hearing brief, he was focused primarily on the fact that the petitioner had worked or was related to people who had worked for the Americans. Meaning his brother? His brother, I believe, or maybe an uncle. I'm not entirely sure. But it imputed political opinion based on association with Americans. That was in his pre-hearing brief, and that was also in his argument to the IHA. When he goes before the Board, his case morphs again, and it evolves into something different. And he raises two issues before the Board, which we cite in our brief, and I think it's on page 51 of the record, having to do with considering economic persecution and psychological persecution, facts which are not in this record at all. And now he comes before the Court, and he raises a number of other issues. We do understand that the Arakeen-Moreno case would preserve issues raised before the immigration judge when the Board issues a Bourbano affirmance. But there's a lot of issues that the petitioners are raising before the Court in their briefs that weren't raised before the immigration judge. So it's our position that even under Arakeen, those issues are not exhausted. The bottom line, this is a factually intensive case. We think it is governed squarely by the Court's decision, and we don't think that any evidence in the record compels reversal of the Board's decision. Should we consider Exhibit B at 172 as being part of the argument of pattern and practice? That's the country reports on human rights practices, and it goes on for pages talking about what amounts to pattern and practice. The Court certainly could consider that, but we would say that the facts of this case cut against any finding. Because look what happened in the facts of this case. He was issued threats, get out of the neighborhood or leave. He got out of the neighborhood, nothing further happened. And most importantly, when he first received the threats, he went to his Shiite neighbors and he went to the police. And all of them were generally supportive of him. Well, the Shiite neighbors said, stay and we'll protect you. Exactly. And the police said there's nothing we can do. Exactly. But contrary to other cases where police have been much less supportive, if, in fact, there were a pattern of practice, we suggest the facts would be different. The facts of this record do not support a finding of pattern and practice. And we think that the wiser course, again, for the Court is to follow its precedent decision and win. Judge Traub took my question. Thank you. I submit your question, Your Honor. This concludes the government's case. Thank you. I think you all used all your time. I'll give you a minute since you're students and you're here giving me the business for the first time. I thank you, Your Honor. Not my norm. There are just a few points I'd like to make. You have a minute. One, Your Honor, Knezovic was similar to this case in that it was a get-out-of-town case. Slightly different circumstances, but they were being effectively told to get out of town by the Croatian forces. They fled in 1995, did not enter the U.S. until 1996. After they fled, nothing happened to them. In terms of Lim itself, this Court did find that Mr. Lim had a well-founded fear of future persecution based on the threats that he received. Finally, regarding pattern and practice of persecution, I would ask this Court to compare our case to the Avotoba case, where pattern and practice was found against Armenians in Russia under far less horrendous conditions than what Mr. Yosef experienced. In conclusion, I would like to ask this Court to remand this case back to the agency so that the facts of this case can be considered under the correct legal standards. Avotoba is cited in your brief. Excuse me? Avotoba is cited in your brief. Yes, Your Honor. Thank you very much.
judges: Thompson, Trott, Nr Smith, Cjj